AVCO MANUFACTURING CORPORATION *v.* WILLIAM F. CONNELLY, TAX COMMISSIONER

WYNNE, C. J., DALY, MURPHY, COTTER and MACDONALD, Js.

Argued November 7, 1957—decided March 25, 1958

*John S. Barton,* with whom, on the brief, was *Gordon M. Tuttle,* of the New York bar, for the appellant (plaintiff).

*Walter T. Faulkner,* assistant attorney general, with whom were *F. Michael Ahern,* assistant attorney general, and, on the brief, *John J. Bracken,* attorney general, for the appellee (defendant).

*H. Eugene Heine, Jr.,* of the Pennsylvania bar, with whom, on the brief, were *John N. Stull,* of the New York and Pennsylvania bars, acting assistant attorney general of the United States, *Simon S. Cohen,* United States attorney, *Henry C. Stone,* assistant United States attorney, and *A. F. Prescott,* of the Maryland bar, as amicus curiae.

MacDonald, J. In 1953, the defendant levied against the plaintiff a sales and use tax deficiency assessment which, with statutory interest, totaled $76,954.29. This assessment was imposed, under the provisions of the Sales and Use Tax Act (General Statutes, c. 104, §§ 2090-2115, as amended), with respect to the purchases of certain so-called facilities, consisting principally of machinery, for a large aircraft engine manufacturing plant located in Stratford and owned by the United States of America. The plaintiff appealed under § 2106 to the Superior Court, which affirmed the tax deficiency assessment and dismissed the appeal, and from that judgment the plaintiff has appealed to this court.

The facts found by the court may be stated in summary as follows: In 1951 the United States, as the

owner of the large manufacturing plant in Stratford formerly occupied by the Chance-Vought Division of United Aircraft Corporation, awarded to the plaintiff certain supply contracts for the production by the plaintiff, at this plant, of aircraft engines and parts for the air force of the United States. At about the same time, the government awarded to the plaintiff facilities contracts, so-called, providing for the use by the plaintiff of the government-owned plant and facilities and, further, for the purchase and installation of certain new facilities. Following approval by a government contracting officer assigned to the plant, certain new facilities, principally machinery, were purchased, installed and used for the production of the engines and parts. The plaintiff received no profit on the purchase and installation of the facilities, all of which were purchased, used and maintained under the constant supervision of government employees.

The basic authority under which the government entered into the facilities contracts with the plaintiff was contained in the Armed Services Procurement Act of 1947 (62 Stat. 21, 41 U.S.C. §§ 151-161) and the regulations issued and published thereunder, which defined the term "facilities contract" as "a contract under which industrial facilities are provided by the Government for use in connection with the performance of a separate contract or contracts for supplies or services" (32 C.F.R. § 412.101-8 [1951]), and the term "property provided by the Government" as including both facilities actually furnished by the government and those acquired by a contractor under a contract (id. § 412.101-2 [b]), and provided that title to all facilities furnished to a contractor should remain in the government and that title to facilities acquired by a contractor the cost

of which is reimbursable should vest in the government at the earliest practicable time. Id. § 412.405. In accordance with the policy and requirements of these regulations, the plaintiff's facilities contracts with the government expressly provided, in clause 4 (A), for vesting of title in the government immediately upon delivery by the vendor.[2]

When the plaintiff acquired facilities, the purchase orders specified that shipment was to be f.o.b. the vendor's plant, and each purchase order stated "[t]his equipment is purchased on behalf of the United States Government and will be Government owned." Applications for bills of lading for transporting the facilities specified that "[t]itle to property during transportation is vested in the United States Government." The plaintiff paid each vendor for the facilities, some of which were acquired in interstate commerce from vendors outside of Connecticut and some from vendors within the state, and after arrival of the facilities at the plant and inspection by air force employees, the government reimbursed the plaintiff for the cost of the facilities.

Under the relevant provisions of the facilities contracts and the armed services procurement regulations, the schedules of equipment to be acquired by the plaintiff had to be approved by the government;

---

[2] "Title to all property furnished by the Government shall remain in the Government. Title to all property purchased by the Contractor, for the cost of which the Contractor is entitled to be reimbursed as a direct item of cost under this contract, shall pass to and vest in the Government upon delivery of such property by the vendor. Title to other property, the cost of which is reimbursable to the Contractor under this contract, shall pass to and vest in the Government upon (i) issuance for use of such property in the performance of this contract, or (ii) commencement of processing or use of such property in the performance of this contract, or (iii) reimbursement of the cost thereof by the Government, whichever first occurs."

the government reserved the right to furnish any or all of the facilities directly; the acquisition of any facilities by the plaintiff from third parties was subject to the prior approval of the government; the use of all facilities was specifically controlled by the government; the government reserved the right to divert any or all facilities acquired by or furnished to the plaintiff; substantially all risk of loss or damage to the facilities was assumed by the government; the government retained the right at all times to terminate or limit the plaintiff's right to use any or all of the facilities; and all shipments of facilities title to which was vested in the government were, subject to the approval of the government contracting officer, to be made on government bills of lading.

The plaintiff issued purchase orders to vendors on forms containing the plaintiff's name in prominent printing at the head, but the terms were as revised and approved by the contracting officer. Each order stated: "This equipment is purchased on behalf of the United States Government and will be Government owned." Each order instructed the vendor to make shipment by a government bill of lading, made reference to "attached instructions for obtaining" such a bill, and was accompanied by a form of application for one. The application form contained, over the signature of a government contracting officer, the statement: "Title to property during transportation is vested in the United States Government and transportation charges are properly payable from public funds." In some instances, vendors made shipments on commercial bills of lading instead of on government bills, as instructed, and in such cases the plaintiff paid the shipping charges and was reimbursed by the carrier after the government, upon investigation and certification by the contracting officer, had paid

the carrier at the lower rates applicable to government bills. Where government bills were used originally, the shipping charges were paid directly by the government at the outset. On all bills of lading, the plaintiff was named as the consignee, and the vendor's invoices were made out to the plaintiff, which paid the invoices with its own funds and processed the documents relating to the purchases through the resident government auditor in order to obtain reimbursement from the government in accordance with the terms of the facilities contracts. The plaintiff was, in fact, reimbursed by the government for all facilities thus purchased during 1951.

Shortly after a facilities item arrived at the plant, a government employee and an employee of the plaintiff made a preliminary inspection to confirm its arrival in good condition, and it was tagged or marked as government property, as required by the facilities contract. At some later time, often several weeks after delivery and after the equipment was installed and in operation, a final inspection was made by the government representatives, this further inspection being a condition of reimbursement of the plaintiff for its expense in acquiring the facility. At no time did the plaintiff record any of the facilities thus purchased as its own property or make any claim of ownership of them, and it used them solely for the production of engines and engine parts under its supply contract with the government.

Upon the above facts, and upon several additional findings which have been attacked by the plaintiff, the trial court reached the conclusion that the plaintiff, and not the government, as claimed by the plaintiff, was the purchaser of, and took title to, the facilities in question; that the transactions which occurred within Connecticut were subject to the sales tax and

those which were consummated outside Connecticut were subject to the use tax; and that the assessment made by the defendant was valid and should stand.

In twenty-seven assignments of error, the plaintiff seeks extensive corrections in the finding of subordinate facts, but comparatively few of the corrections sought would affect the disposition we make of this appeal. Those which are vital to the plaintiff's appeal and which, accordingly, require determination involve the findings that title to the facilities "vested in the Government after final inspection and acceptance by the Government"; that "title to the facilities passed from the vendors to the plaintiff as purchaser"; that the final inspection of facilities was provided for in the facilities contracts "as a condition of acceptance of title by the Government"; and that "acceptance of title" was "accomplished customarily many weeks after the facilities were received, installed and operated by the plaintiff."

The fundamental questions at issue in this appeal are When did the United States acquire title? and Did title pass from the vendors to the plaintiff or directly to the United States? The inclusion by the trial court of its conclusions on these ultimate questions of title in its finding of subordinate facts made inevitable the conclusions attacked by further assignments of error as well as the refusal to rule in accordance with the plaintiff's claims of law. These claims were that title to the facilities passed directly from the vendors to the government; that the transactions, being sales to the United States, were expressly exempt from the sales and use taxes; and that the imposition of such taxes was in violation of the governmental immunity of the United States from state taxation.

The Sales and Use Tax Act, designated since 1953

as the Education, Welfare and Public Health Tax Act (Cum. Sup. 1955, § 1161d), specifically provided in § 2096 (a) that the tax shall not apply to "[s]ales of tangible personal property to the United States . . . or its . . . respective agencies." Section 2091 (3) defined "sale" as meaning and including "[a]ny transfer of title, exchange, barter, conditional or otherwise, in any manner or any means whatsoever, of tangible personal property for a consideration." Under this definition, the party to whom title is transferred is the party to whom the sale is made, regardless of the fact that another party participates in the transaction by sending a purchase order to the vendor and by paying the vendor's invoices under a contractual relationship providing for the reimbursement of that party by the purchaser.

Upon the facts of this case, the party to whom title to the facilities directly passed was the government of the United States. This was clearly the intention of the plaintiff and the government in view of the language used by them in the facilities contracts and in the purchase orders, applications for bills of lading and other documents related to the contracts. Their intention is ascertained "from the language used, interpreted in the light of the situation of the parties and the circumstances surrounding them." *United Aircraft Corporation* v. *O'Connor*, 141 Conn. 530, 538, 107 A.2d 398. Here, not only the express language of the contracts but the surrounding circumstances, including the controlling government regulations and the conduct of the parties, pointed to the fact that the government was to be the owner of all facilities from the moment of shipment by the vendors. Since all of the purchase orders specified that shipment was to be f.o.b. the vendor's plant, title passed from the vendor upon delivery of the fa-

cilities to the carrier. General Statutes §§ 6632-6634. It was entirely consistent with our law of sales that payment only be postponed and that, if later inspection disclosed the facilities not to be as ordered or authorized, the government could rescind the sales and refuse payment. § 6634 (rule 3). The United States Supreme Court, in holding that a right of subsequent inspection was not inconsistent with provisions for prior passage of title to the government, has stated: "We agree with the Court of Claims that 'the United States and the contractors were privileged to write into their contract such terms as they saw fit' and that 'provisions for a final inspection at point of delivery or for the rendering of a further service by the contractor at that point were not inconsistent with and could not be invoked to nullify a specific provision under which the title to the property passed to the United States by delivery at the initial point of shipment to the carrier as agent.' " *Illinois Central R. Co.* v. *United States,* 265 U.S. 209, 213, 44 S. Ct. 485, 68 L. Ed. 983.

Since the facilities involved were purchased from vendors outside as well as within Connecticut, we are concerned with both the use tax and the sales tax. "The sales tax, on the one hand, and the use tax, on the other, are distinct from each other. They are based on different conceptions and are assessments on different transactions, even though, in many instances, they bring about the same result. *Connecticut Light & Power Co.* v. *Walsh,* 134 Conn. 295, 300, 57 A.2d 128. Speaking generally, the sales tax is imposed upon transactions within the state, and the use tax upon articles bought in other states which, if bought in Connecticut, would be subject to the sales tax." *United Aircraft Corporation* v. *O'Connor,* 141 Conn. 530, 536, 107 A.2d 398. In the case at bar,

the finding does not disclose where the various facilities were purchased and, since we reach the same result in both instances, we need not distinguish between the two types of tax except in a general way.

The defendant emphasizes the fact that the sales tax is levied on retailers for the privilege of selling tangible personal property at retail and, although § 2092 (2) provides that the retailer shall, in turn, collect the full amount of the tax from the consumer, refuses to concede that it is, in effect, a tax on the purchaser or consumer. It is clear, however, under the decisions of the United States Supreme Court in *Kern-Limerick, Inc.* v. *Scurlock,* 347 U.S. 110, 74 S. Ct. 403, 98 L. Ed. 546, and *Alabama* v. *King & Boozer,* 314 U.S. 1, 62 S. Ct. 43, 86 L. Ed. 3, that a sales tax imposed upon a vendor who, in turn, is required to collect the tax from the purchaser is a tax upon the purchaser and that the imposition of such a sales tax in a transaction where the purchase is actually made for the government is unconstitutional. In the *Kern-Limerick* case, which confirmed governmental immunity from a sales tax, the government's contract went further than the facilities contracts involved here in expressly designating the contractor as purchasing agent for the government, but it is obvious from the circumstances previously enumerated from the findings that the present plaintiff was duly authorized by the government to act on its behalf in acquiring the facilities, even though the word "agent" was not expressly used in the contracts.

In the *King & Boozer* case, supra, cited by the defendant in support of his contention that the plaintiff, rather than the government, was the purchaser, the United States Supreme Court did reach the conclusion that the contractor was the purchaser and

held that the Alabama sales tax imposed upon the contractor was constitutional. In that case, however, the contract provided that title to the materials purchased by the contractor should vest in the government "upon delivery at the site of the work . . . and upon inspection and acceptance in writing by the Contracting Officer." Id., 10. A further distinguishing feature of that case was the holding by the Alabama court, and the consequent assumption by the Supreme Court, that the Alabama statute clearly imposed a sales tax on the person ordering, and legally obligated to pay for, the goods. The statute thus placed less emphasis on the transfer of title than does the Connecticut act.

Turning now from the sales tax to the use tax imposed by § 2095 (1) and its amendments, it is, as stated by the defendant in his brief, "intended to complement the sales tax by creating equality of taxation of purchasers on the use of property purchased outside the state," being designed to reach transactions which cannot be reached as sales because of the so-called commerce clause (Art. I, § 8, clause 3) of the constitution of the United States. *McLeod* v. *J. E. Dilworth Co.*, 322 U.S. 327, 330, 64 S. Ct. 1023, 88 L. Ed. 1304. The defendant, however, seeks what would appear to be a strained and unintended construction when he suggests that "in the application of . . . the use tax the purchaser is obligated to pay the tax, regardless of the ownership of the property . . . used." The use tax was itself imposed by § 2095 (2) upon "[e]very person storing, using or otherwise consuming in this state tangible personal property purchased from a retailer," and "use" is defined in § 2091 (6) as including "the exercise of any right or power over tangible personal property incident to the ownership of that property."

It seems clear that storage and consumption, as well as use, must be incident to ownership for the use tax to apply. To construe the statute otherwise, so as to purport to tax the use of the facilities under the circumstances of this case, would raise a constitutional question where, as here, the owner was the United States.

The familiar doctrine of implied governmental immunity was first stated by Chief Justice John Marshall in *McCulloch* v. *Maryland,* 17 U.S. (4 Wheat.) 316, 4 L. Ed. 579, as giving the federal government the right to utilize means of its own choosing in carrying out its delegated powers free of interference by the states in the exercise of their taxing powers, and the Supreme Court "never has departed from that basic doctrine or wavered in its application." *United States* v. *Allegheny County,* 322 U.S. 174, 176, 64 S. Ct. 908, 88 L. Ed. 1209; see *Kern-Limerick, Inc.* v. *Scurlock,* supra, 117; *Esso Standard Oil Co.* v. *Evans,* 345 U.S. 495, 498, 73 S. Ct. 800, 97 L. Ed. 1174; *S.R.A., Inc.* v. *Minnesota,* 327 U.S. 558, 561, 566, 66 S. Ct. 749, 90 L. Ed. 851; *Mayo* v. *United States,* 319 U.S. 441, 448, 63 S. Ct. 1137, 87 L. Ed. 1504. The recent decisions by the Supreme Court in *United States* v. *Detroit,* 355 U.S. 466, 495, 505, 78 S. Ct. 474, 2 L. Ed. 2d 424, *United States* v. *Muskegon,* 355 U.S. 484, 495, 505, 78 S. Ct. 483, 2 L. Ed. 2d 436, and *Detroit* v. *Murray Corporation,* 355 U.S. 489, 78 S. Ct. 458, 486, 2 L. Ed. 2d 441, 460, all decided March 3, 1958, indicate some modification of this doctrine with respect to the taxation of government-owned property used by private contractors, but are clearly inapplicable to the case before us. In those cases the court upheld a Michigan statute providing that when the tax-exempt property is used by a private party in a business conducted for profit,

that party is subject to taxation to the same extent as though it owned the property. The Connecticut statute involved here, as previously pointed out, expressly exempts sales of tangible personal property to the United States and further specifically provides that the use of such property, to be subject to the use tax, must be incident to ownership.

In *General Motors Corporation* v. *State Commission of Revenue & Taxation,* 182 Kan. 237, 320 P.2d 807, decided on January 25, 1958, after the argument of this appeal, the Supreme Court of Kansas held transactions almost identical to those involved here to be nontaxable under the quite similar provisions of the Kansas sales and use tax act, stating in one of the concluding paragraphs of its opinion: "From the record it is readily apparent that the contracts involved, and the operations under them, were merely the means by which the government purchased the property and equipment for the corporation's use in manufacturing military aircraft for the government in a government-owned aircraft plant. The government owned the property upon entry into the state and continuously thereafter. In the last analysis, the use of such property by the corporation was merely to accomplish the purpose of the owner— the production of military aircraft for the government. Its use of the property was not 'incident to the ownership of that property.'" We are in accord with this decision of the Kansas court and consider the reasoning and language of the opinion applicable to the facts of the case before us.

Although it is the general policy of the department of defense that contractors furnish the facilities required for the performance of government contracts, in many instances the ever-changing nature, magnitude and urgency of the specialized material

vital to the defense of the nation and of the specialized facilities necessary to produce that material render it impracticable or even impossible for the contractor to fulfil the government's varied needs with contractor-owned facilities. At times, the government feels it desirable to acquire and keep in readiness for possible future emergencies the tools upon which are forged the weapons of defense. It has been determined by the government that the handling of such purchases through the contractor's existing organization has many practical advantages, which need not be enumerated here. For these reasons and many others, contractors are delegated the responsibility of handling the mechanics of procurement for the government under facilities contracts. They accept and discharge this responsibility, as in this case, without profit to themselves, any profit coming, as it should, on the separate supply contract. Many of the major producers of defense materials have been performing this valuable service in the regular course of their business over long periods as a recognized adjunct to supply contracting. The imposition of a state sales or use tax upon such transactions where, as here, title to the facilities was taken at the outset in the name of the government would be contrary to the specific exemptions of the statute as well as repugnant to the provisions of the constitution of the United States.

There is error, the judgment is set aside and the case is remanded with direction to render judgment sustaining the appeal.

In this opinion the other judges concurred.